Mr. Crowley, when are you ready? I'm ready. Good morning. My name is Daniel Crowley and I represent the appellant Peter Massaro. Mr. Massaro is a former lieutenant with the Fairfax County Police Department. He filed a lawsuit against Fairfax County under Title VII of the ADA in Section 1983 alleging that the former chief of police, Edwin Rossler, retaliated against him for filing a complaint of discrimination. The district court found that we had made out the first two elements of our retaliation claim that there was a protected disclosure and that there was an adverse action but that we failed to prove a connection between the two. On appeal we contend that the district court made several errors including failing to consider critical evidence at all and failing to view other evidence in the light most favorable to Mr. Massaro. I'd like to start by addressing three important things that we think the court overlooked. The first was the testimony of two detectives, La Scala and Guckenberger. Can you be sure and speak up? Move that mic close to you. It's important to hear what you have to say. I'll speak up also, thank you. So the first of these three issues was the testimony of detectives La Scala and Guckenberger and they testified that they were in the parking garage one day when Major Cleveland, who was Mr. Massaro's second line supervisor and who we argue initiated the investigation, approached them and said that they that Massaro was under investigation and that he should have known better because he's had a target on his back ever since he filed a complaint against the chief. This is again the person who initiated the investigation that led to the disciplinary action explicitly tying it to the protected disclosure just out of the blue in conversation with other detectives. The second issue was the testimony of Lieutenant Hershey. Lieutenant Hershey was the IAD investigator and he testified that this investigation was conducted in a different manner than every other one he's ever done. Normally he would be given a case, have days to study it, and prepare his questions, but in this case he was required to interview the the officers involved immediately and his impression at the time was that this was because the chief of police on down is how he said it wanted to use this investigation to get rid of Pete. Lieutenant Hershey also testified that during the questioning of Lieutenant Massaro, Major Cleveland sat in the room next to him along with Lieutenant Hershey's supervisors and Lieutenant Hershey would take breaks during the interview. He would go out and talk to his supervisors. His supervisors would tell him some questions that he should ask and throughout this interview, Massaro was pressed on things like his opinion of Lieutenant Labarca as a commander, whether she should be a commander, and his opinion on whether or not she should lead special operations division. And Lieutenant Massaro first didn't, he tried not to answer the questions. He said I don't want to answer those. I know how you're going to use those, but it was a compelled interview so he had to and his answers to those were then later used as justification for the adverse action. They were in Chief Rossler's written decision. Lieutenant Hershey also testified that he did not find that Lieutenant Massaro had violated the anti-discrimination policy and that was important because a violation of the discrimination policy raises the stakes. It's a fireable offense. So it was a very serious piece of this and he had originally found that Lieutenant Massaro did not violate that just as the county did when the county investigated it. And he went and he showed his findings to his his major, Major Owens of IAD, and Major Owens told him take another look at that. There's a question with all retaliation questions is a question of causation and here wasn't there an 18-month lapse between the filing of the complaint and the adverse employment action of the transfer? There was I believe an 18-month lapse between filing the official complaint of discrimination and the final decision on the disciplinary transfer. But if there's a year and a half lapse between the complaint and the adverse employment action of transferring from the academy, doesn't that cut against you? Well your honor, temporal proximity is one way. I mean that's a good hunk of time. There are two things. One, temporal proximity is one of the ways that you can prove discrimination. It's not necessary. Had Chief Rostler written a decision five years later that said I'm firing you because you filed that complaint against me, there would be discrimination. But if someone was out to get Mr. Massaro, it was likely to wait 18 months? Well I don't agree your honor that 18 months would be the operative time frame because the investigation started in May 2019 and there's a process that the chief would have to go through in order to accomplish this. So of that 18 months, roughly I think 10 of them, 12 of them. When was the complaint filed? The complaint occurred. I mean when was the complaint filed against the Rossaro, the police chief? That investigation, the complaint, that began in May of 2019. No but what I'm asking you, when was the complaint against the police chief filed? The complaint against the police chief was filed in September of 2018. It was the transfer of Lieutenant Massaro? From him, the transfer of the plaintiff from the academy. He was transferred from the academy in March of 2020 I believe. That's all I'm just saying is that's a good bit of time. It is some time passing your honor, but during that time it wasn't that the chief waited. Most of our cases don't involve, most of our retaliation questions don't involve a year and a half from the so-called protective action, protected action, until the adverse action. That may be your honor, but in this case it was a long time coming in the sense that the investigation begins and it I think you're right. I mean if it had been a long period of time and they had expressly said, hey I did this because you complained about being passed over on, you know, for race and gender a year ago, two years ago, three years ago, we probably wouldn't have this discussion. The temporal proximity is usually when you don't have that sort of direct evidence. You're trying to see causation by other evidence. Still it's pretty, and I'm not sure we do have that direct evidence. I think what you're trying to use is what you claim to be mainly irregularities with a LaBarca incident to show that what really happened at the end of LaBarca was traceable back to the complaint, you know, eight months or however long ago. And so let me, if I could just ask about that, we do have this literary case that talks about how if you have, if you don't have direct evidence, which I, yeah, maybe you dispute that, but let's assume we don't have direct evidence here and we have a long period of time, you know, the question would be does the LaBarca incident and the stuff you complain about there fall within that literary continuous pattern of action that displays animus? Yes, Your Honor, we think it would, but it's not just direct evidence. It's direct or indirect evidence. You can prove retaliation through circumstantial evidence also. It's not just time or direct evidence. So here what we have that I think makes our case stronger involved an employee who had filed a complaint and then had her job duties reduced, right? And there's no obvious reason that that's retaliation. Someone doesn't say I'm doing this to you because of the complaint you filed, but it's something negative that happened to them during that timeframe that leads one to think that there's this continuing animus. And what we have here is even before the issue with LaBarca, we have Major Cleveland being assigned to the academy and having a conversation with Massaro and Reif. And Reif was Massaro's first line supervisor who's one step under Major Cleveland. And Major Cleveland told him that he was transferred to the range because the range was under scrutiny. He gave a number of reasons for that, but one of the reasons, he said, was that your complaint against the chief didn't help either. And he told Massaro that he came with a clean slate and that you're still here. It was something that he repeated twice. And both Massaro and Reif understood that as a threat, that you're still here but you won't be if you slip up because he's there in order to be in position to retaliate against him. But Cleveland didn't, he didn't make any of the decisions in this course of, there were many people who reviewed other people's decisions and I know you say Cleveland was part of the, you know, he helped LaBarca report it initially, but he wasn't in that chain. And then when he was pressed, he denied that anybody, that Rossler or anything, did a negative thing to him about the plaintiff or, you know, suggested anything. He said, I never even talked to Rossler. So Cleveland, it sounds like he had these kind of hunches and would just spout them off without any factual basis, right? It's just speculation. Well, he did, Your Honor, have a role because he was the one who initiated the investigation. I know it was Lieutenant LaBarca's complaint, but it was his idea to report it. He walked her to the office and helped her file the complaints. He then, we think, participated in the investigation by sitting in the room next to them while they were discussing what questions should be asked. Yeah, I'm just questioning kind of how much you can actually tie any decision maker to what Cleveland says about, you know, it didn't help that you complained or even talking to the officers. When he was asked about that, he says, well, actually, I didn't really talk to anybody about it. I didn't know anything. I was just, you know, had a feeling. That's right, Your Honor. There is no testimony in the record where someone says, Chief Rossler told me to retaliate or anything like that. You generally don't find that in retaliation cases. But what we have is the circumstantial evidence of the statements of Major Cleveland indicating that he, as the person who initiated the complaint, believed the chief wanted Massaro gone. So it indicates his own state of mind, independent of the chief, that he thought this was the goal of the investigation. This would serve the chief's purposes. But the fact remains is the question you're requiring us to, you know, the question is, what's good circumstantial evidence and what circumstantial evidence requires us to take a speculative leap? And I wonder, you know, why this isn't the latter. Another point I have here, it seems to me that the police department was validly concerned about what happened here. Because if you go to your supervisor, and I don't, you know, maybe it's the case that someone is promoted because they're in a protected group and someone is not. But, and I don't know, I have no idea what this is, but if you go to your supervisor and say, you got your position because you were a particular race, or you got your position because you are particular ethnicity or gender. I mean, that's one heck of an insult. And that really does wonders for the chain of command, doesn't it? I mean, police departments work on a chain of, on a chain of command, and if you're, if you're going around and insulting your supervisor, which this was, it was, it was insulting. I'm just, whether it's true or not, it was an egregious act of bad judgment. Thank you. And officers are supposed to exercise judgment, and he's admitted saying the only reason you were promoted over me is because you were a member of a favored group. And I would say if somebody's acting that insulting, I'm not sure I would want them as a, as the head of the shooting range, which is a heck of a sensitive position, but this was, this was bad judgment. And it would be bad judgment even in a corporate context. If you went to a vice president and said the only reason you're sitting over me is because you're of this race or that race, it's just, it's very insulting. And I, so I appreciate you taking that up, but that, I mean, there are a whole lot of other problems that I have here when it comes back that you're, you're asking me to take a speculative leap. This was a grant of summary judgment, and it says a genuine dispute of material fact. I don't know when you take into account that Mr. Burgess had complained with, that the police chief had and had lodged complaints. Nothing was ever done to him, and he lodged a complaint that was very similar to Mr. Massaro's. And before the thing ever got up to the police chief here, it had to go through a lot of different stages, all of whom found that there was at least one or another problems with this individual. He, the whole review process which took place in the state does not paint this individual as an admirable police officer or necessarily somebody you would want in a supervisory position as the, of the range. So you have a lot, you have a number of things to explain away. Your Honor, I see that I've run out of time. Yeah, go ahead. Okay, so in order to prove our case, all we have to show is that the comment to Labarca, the disrespectful comment to Labarca was not the reason for the disciplinary action. So it can be that, that Mr. Massaro violated that regulation, but that they're really using it because they're mad at him for filing the complaint. That's one way that we can win this case. We don't have to prove that the original violation didn't occur, but we do dispute that. And Your Honor, it's how that, the context of that conversation is disputed. And the court recognized that, but then dismissed that as immaterial. And we think that that was wrong because the whole case is about that conversation, or at least the original complaint was. And Lieutenant Massaro says that, that Lieutenant Labarca came up to him and started this wide-ranging conversation about things, including her feeling that the Deputy Chief was using... Well, you wonder, stepping back, the whole department seems like a bit of a viper's nest. Because you have this complaint, and then you have a complaint about the complainer. So these complaints are going back and forth on these questions of identity. And you wonder, well, you know, it might be a good idea for all this energy that's being spent on all these complaints and all this litigation to be spent on ensuring the best possible police work. But... I don't... Poor guy, you know, he fell at the head of the department. He's trying to obey federal civil rights mandates. He gets mashed from one side, and then he's trying to... If he doesn't do that, he's going to get mashed from the other side. I mean, who would... You get whipsawed in this kind of situation, none of which seems to me to bear a particularly material relationship to service of a public and effective police work. Your Honor, in the context of that conversation, the context of the conversation makes a difference. As I said, Lieutenant Massaro's side of the story was that Lieutenant LeBarker approached him, talked about issues such as the deputy chief trying to highlight her gender as the new female commander that we have. And she was expressing her discomfort with that. And in that context, asked Mr. Massaro directly, do you think that that had a role in my promotion? And he answered yes. And the panel hearing, when there is an evidentiary hearing before a panel within this that there's a disputed fact that we can't resolve. Because if Lieutenant LeBarker had asked him directly, and she's his supervisor, what he thought, and Lieutenant Massaro had already filed a complaint about this promotion process... You have some rebuttal time. I just worry about the whole environment seems like a viper's nest. But I ask my colleagues if they have some questions. All right. Thank you. Good morning, Your Honors. May it please the Court, my name is Emily Blake and I'm here on behalf of Fairfax County. We ask that this Court affirm the District Court's ruling that summary judgment should be granted for two reasons. There's no direct evidence in this case, and then under the McDonald test, there is no evidence of circumstantial evidence. Because the lengthy transfer to the academy, that's eight months. That's an eight-month gap that has not been explained by plaintiff. And this case stated in Roberts, something that's been upheld in this circuit for many, many years, that a temporal gap negates any inference of a causal connection between the two. And plaintiff has failed to overcome that negation. In turning to the direct evidence, my colleague here was just referring to Cleveland's statements and is relying heavily on Cleveland's statements. This Court held in Walton that it was necessary for the supervisor or the final decision maker themselves be the ones making these statements. In Walton, the supervisor, the plaintiff's supervisor said, I don't want to work with her. If I work with her, she'll just file an EEOC lawsuit. That was clearly direct evidence that somebody was saying, I don't want to work with you in retaliation for her prior EEOC suits. You know, Rossler's testimony was a little here and there, wasn't it? His deposition testimony. He said, Massaro is accusing me of things I haven't done. And, you know, he seemed upset about that. And that was why he did what he did. And we have to parse out whether he was upset about Massaro making these comments to Labarca in the workplace or upset about him making those same kinds of comments in a complaint that was filed much earlier, right? But he's, you know, Rossler's testimony is not crystal clear. I would, to me, the way that the transcript reads is that Rossler stated in his final decision that what the statements that Massaro said about Labarca and why she was promoted was not true. He was then pressed in his deposition, well, why do you even say that? How do you know it's not true? Chief Rossler was the final decision maker. He was being told by Massaro, essentially, that you discriminate based on gender or age or race when you're deciding this promotion process. So the answer to the question is, how do you know it's not true that discrimination was involved in this process? Because I, the final decision maker, did not discriminate. That's not true. So I think he was just fairly answering the questions that were being posed to him by plaintiff's counsel and not saying or admitting, oh, I retaliated against Massaro because he filed this EEOC complaint. And he did seem to focus more often than not on, he said, bringing this into the work environment and saying it to her, even though, you know, these, he's talking about the same process that he complained about, you know, months and months ago, right? But that coming into the workplace and saying to your supervisor, hey, you were hired because you're a woman, is different and causes different harms than filing a complaint against the chief of police and saying you're only promoting these people because they're women. Correct, Your Honor. And even when you have this argument that Labarca was above him in rank and he was compelled to truthfully answer her question, I think Captain, or no, it was Major Cleveland who addressed this in his deposition. You're both adults here. You can see where this conversation is going. If you have these views, that doesn't mean that you can then say them in the workplace like that, especially when you know that she is going to find it offensive. That's not constructive criticism. Massaro tried to categorize this as constructive criticism in his deposition. He should be allowed to give somebody constructive criticism. That's not constructive. She can't change her gender. So he was clearly stating that because it was his personally held opinion. He knew that she would find that offensive or that it would be upsetting to her and that is a violation of that policy. So Counselor, yeah, I'm just trying to look at this and we're of course at a situation where construed evidence in the light most favorable to Mr. Massaro. And I think you're right. The time period is helpful to the defense and to the district court's decision. But we have the testimony about Cleveland saying he's got a target on his back. We've got the testimony about Cleveland saying that your complaint didn't help things. We've got testimony that Cleveland told Massaro after a second interview that your resume is no better than mine and I think LaBarca is qualified. What have you got to say about that? You've got irregularities alleged in this process. I mean the fact that as at least there's some testimony that LaBarca wasn't even going to file a complaint and Cleveland pushed it. That they did the interviews the same day and the day after and that they relieved him of his duty for inconsistent statements at least in part when I don't know there were any. And then you kind of have the testimony about Rossler that Judge Rushing's talking about. Now maybe at the end of the day that's a lot of you know kind of you know blowing smoke and it doesn't you know end up to convince a jury. But is that not even something that creates a genuine issue of material fact? First your honor, I would say that the eight that the first retaliatory act occurred in May of 2018 that's still an eight-month gap. And I do want to get to this later but you know just saying that Massaro or Cleveland was transferred to the academy for the sole intention to retaliate against Massaro that's not demonstrated in the record. Cleveland's actions or Cleveland's statements that were made, he's not a decision maker in this case. He and the court said in Walton that it is this decision maker who needs to be making these statements. And then it was in Roberts and in the Jacobs case where we're talking about inferences that a plaintiff is asking the court to draw. The plaintiff is asking the court to assume that Cleveland has these he's making these statements because he knows something but he he denied that in his deposition and plaintiff hasn't given us any evidence otherwise. In the conduct of the IAB interview there's there's no evidence to substantiate that there is anything irregular about it. Hershey went through this thoroughly in his deposition. Yes it was irregular that I did not have time to investigate this beforehand but no one had ever showed up in the IAB offices before. This is the first time that the complainant was actually there verbally orally making the complaint. It wasn't a written thing and when we talk about you know whether or not Cleveland felt compelled to turn this over to IAB I think the record is clear that he felt very compelled to turn it over to IAB because he did not know whether or not this fell under sexual discrimination. And at the record at JA 1946 we have the Fairfax policy that states that commanders and supervisors have a responsibility to ensure that no department employee is subject subjected to unlawful discrimination or sexual harassment. And if you do you make a statement. And then similarly in that same policy it talks about if you believe you are the victim of such a thing you can either go to someone in your supervisor or you can go to IAB. Labarca had the choice. She decided to go to Hurley and Cleveland. Cleveland then felt compelled to turn it over. And then when we consider oh well Cleveland turned it over out of malice or out of some sort of retaliation. Well Labarca's supervisor Hurley was there as well. There's no evidence he was not deposed. There's no evidence that he would not have turned it over to IAB that at any point he it's inappropriate to turn this over to IAB. He sat there and listened and it got turned over to IAB and an investigation began. Can I ask you about the use of the IAB interview? And to go back to Rossler's testimony was he was he inconsistent about saying whether he used that as a reason for his decision to transfer Massaro or not? At one point he said he thought using it would be unfair but then I thought he said he kind of considered everything including the video and and I don't know if there's a distinction being made between the substance and the sort of emotional display or if he is just speaking out of both sides of his mouth on that. The way that I read the record is that Captain Wall, Major Blakely and Chief Rossler were all concerned about what happened in the interview. Massaro has been a police officer for many decades at this point. He knows you know what it is to be interrogated. He knows how to respond and he lost his temper pretty emphatically in that interview and that was concerning. Chief Rossler did say in his deposition that he you know he said something along the lines of I can't ignore it you know like that is something that happened and so while he gave the disciplinary action because of the statements that Massaro made to LaBarca I think it would be impossible for any human to ignore after watching that video what was said in that video and how it was said. Was the transfer because of the statements Massaro made to LaBarca? Yes well yes and because it was the third time and so I want to address that because in Plaintiff's reply brief he talks about oh well the other two instances were because of using profanity. That is a gross understatement. JA 163 through 165 is Captain Wall's report and that's when he talks about the other two instances involving Lieutenant Massaro and the first one was talked about was he was writing a performance evaluation for an employee that had previously complained of discrimination in the workplace and when she told Sergeant Massaro at the time that she intended to impel the evaluation he cursed at her and I'm not going to repeat that language but that's in the record and then similarly this other incident he is cursing at a female officer in front of her colleagues saying that she is useless and then he also allegedly grabbed her arm and challenged her to a fight so this is now the third instance involving a female officer. Is it and I think that's you know quite you know compelling information yet I don't recall it being in the written memorandum to Massaro that notified that documented officially his transfer. I'm sorry I don't understand the question. I may not That's probably my fault for asking a bad question. I think the record contains memorandum from Rossler to Massaro documenting his transfer as head of the academy there. You know I'm talking about the actual documents that where he says he's being transferred and why. Yes. Do those documents reference those prior episodes? I cannot recall specifically if Rossler's document does. I know that Captain Walls and Major Blakely's do specifically and I know that you know Chief Rossler said that he reviewed all of the documents everything that had been put into the IAB file up at that time. Just seems like if that was a reason and it would be a good one this is you know first time okay second time okay here we are number three you would think that would show up if that was the reason in the official notification. Well when we talk about progressive discipline I don't think it's you know that had already been demonstrated in the record through the other two he was just saying you know very plainly here is the reason why I am sustaining the finding and encouraging or ordering a lateral transfer. And speaking of transfers this reminds me of a point that I wanted to bring up earlier when we talk about you know Plans Council here said that there was a process that the chief had to go through in order to even you know he's trying to explain the significant time period because there is a quote process that the chief had to go through. No there's really not. I mean the chief can transfer anyone at any time for any reason and the record has been very clear about that. Matos, Major Matos was transferred right before this. I believe it was Jeffrey Reif. Lieutenant Reif was talking about how he had been transferred. I mean people. Counsel let me ask you this. These are the police department as many police departments are heavily bureaucratized and there are multiple levels of review before something gets to the chief. Did he try to short circuit the different stages of review within the department before he made the decision? Did he interfere with the prior stages of review? Did he try to circumvent? Did he try to skip around them or in some way skip over them? In other words to what degree was regular order followed in considering Mr. Massaro's performance? There is no allegation that procedure was not followed. The procedure completely played out pursuant to policy. There was the first review with Wall. There was a second review with Blakely. There was the three-person panel. So how many stages of review were there before it finally got up to the police chief? Well there was the initial finding by IAB which was Hershey. There is the first stage of review which was Captain Wall. There is the second stage of the review which was Major Blakely. Then there was the three-person panel. And then it was Chief Rossler's decision. And then that was it. So how many stages of review were there? There were four? Yes. All right. Okay let's say there were four. Now each one of those stages of review found a particular problem with Mr. Massaro's record. Is that correct? Yes. Well did they find the same problem or did they find different problems or what have you? When you're saying record are you saying his statements to LABARCA? I was just wondering whether they all found some workplace conduct violation, didn't they? Yes. Okay so this is not a great employment record. Each of these four different stages of review found some workplace conduct violation. Yes. So if you were the police chief, regardless of whether there was even trying to put the business with LABARCA to one side, it seemed undisputed that the academy was not performing at a level that would imbue one with a great deal of confidence in it. And some change had to be made which was why Cleveland was brought in. And given these different stages of review and the different workplace conducts that were found, it would make sense that you would want somebody with better judgment in one of the supervisory positions at the academy. I mean the firing range is as sensitive as it can be. They have to, you have to tell officers when they can use firearms, when they shouldn't use firearms. You have to train them to be accurate and particularly in a jurisdiction like Fairfax which has just all kinds of, encompasses a lot of areas, a good many different demographics. And so what I am concerned about is that any time someone in a position of authority says we've got a, we've got a department here that's really important to public confidence and it needs to be shaken up and then those efforts of reform inevitably elicit a retaliation suit for one reason or another. Now in this case it could be the fact that he had filed a complaint, but there could be a lot of other things alleged that someone was vocally critical of whatever. I'm concerned that we're inhibiting police reform by saying anytime you try to transfer someone in an effort to prove what seems to me undisputed that this academy is not operating as it should operate and that Mr. Massaro's record is not what it should be. I wonder whether we're not inhibiting necessary reform within police departments. What's your response? I would agree your honor and that actually does bring me to my last point. So in our brief we brought up the argument that there is a lack of evidence as to a showing of pretext. Plaintiff of course has the burden of persuasion on pretext. Plaintiff cites in his reply brief to the Bostock opinion saying you know the definition of but-for causation has been changed, but that's not actually the case, especially in the Fourth Circuit. This court has previously held in the Gusius, I'm sure I'm pronouncing that wrong, Gusius Property 2016 case that a plaintiff only has to show that there is a but-for cause, not that it was the sole cause. So the Bostock case doesn't really do anything to the Fourth Circuit findings on what is necessary in order to require a showing of pretext and that requires both that the reason is false and that retaliation was the real reason. Here we have four independent decision makers making the same decision. I'm only making the point that police departments need improvements in a lot of areas and we don't want them to become complacent. And there is a danger I think when a new person comes in saying I can't change anything, I've got to go with the previous system or I'm going to be facing retaliation. So the upshot of it all is that you just keep everyone in place so that you won't commit an adverse action. And this would be run the risk of being an anti- police reform decision. If we send up a red flag and say look you try to clean house you're going to have retaliation suits. And of course you might file complaints or whatever just so you can immunize yourself against, you can set up these kinds of lawsuits. We've seen instances where they are. The complainant says I'm going to file a complaint because that immunizes me against any kind of transfer. I don't want to transfer, I'll file a complaint. And then you can set up a retaliation suit all too simply. It is a simple point I'm concerned about with this case. And I would agree your honor. I would agree that it is a concern that Chief Rostler needed to respond to the statements that plaintiff made to LaBarca and that four or three other, you know, a number of other people agreed with him. They all came to that conclusion independently. There's absolutely no evidence of coercion or that any, you know, Chief Rostler inserted himself into this investigation at all. They all came to their own conclusions based on their own findings. And for those reasons we would ask that the court uphold the district court's grant of summary judgment. Thank you. Yes sir, you have some rebuttal time here. Thank you your honor. I'd first like to address the idea that that Peter Massaro had a poor record of performance. Lieutenant Massaro had been with the police department for 25 years after serving in the Marine Corps where he won awards. In 2018, just a year before all this happened, he received the supervisor of the year award. He was, he won the bronze medal of valor and he was handpicked by the chief of police for this very specialized role. In 2019, the year that this happened, he won the department's gold medal of valor. It is the most prestigious award that they can award to an officer. And then he filed a complaint and everything changed and he was put on leave for 10 months, told to go take a mental health examination. The different stages of review did not, if we understate, come back with glowing comments. That's right your honor, they took a view of the... The question is, can Mr. Roessler act upon those stages of review if he didn't try to manipulate the process in some way? Is the person entitled to act upon, as I say these departments are so bureaucratized, but isn't the police chief entitled to act upon the recommendations of four different stages of review? If, whether you think they're correct or not, the question is, was the chief entitled to act upon that? And that's not a retaliatory motive, unless he set up the stages of review to come back with an adverse finding. I don't know that he did that, but the question is, why did he do what he did? And there are two possible explanations, neither of which is exactly helpful to you. One explanation is that he was really upset about the LaBarca conversation. Well, if he did it for that reason, that's still not retaliatory for filing the complaint. And then the other reason is, and that again is not a retaliation, is that he had adverse comments and different stages of review about someone who was in one heck of a sensitive position. And if we say that a police chief can't act on the basis of different stages of review when he's making a decision without being accused of retaliation, the problem is there are all kinds of retaliatory motives and non-retaliatory reasons. I'm not sure that every time you say, oh, well, it could be retaliation, that sets up a genuine dispute of material fact. Because, you know, we've made the point that you don't get immunity. You still have to do a good job. You still have to perform well. And you don't get immunity from the need for a top performance. And sometimes these suits are setups. These complaints are sometimes setups. Your Honor, in this case, the complaint that had been made months before the adverse action occurred, it was, I mean, that's one of the timelines. That's at the high, high end. But my point is that it can't be a setup. It wasn't a complaint made to protect himself because the comment to LaBarca came months after the complaint was filed. But, Your Honor, you also mentioned the appeal process and how throughout the appeal, there were a number of people who apparently shared the chief's opinion. But there was also the panel hearing, which did not, and they recommended no discipline. And one of the points that was made, and there was a three-member panel, and Lieutenant Massaro picked one person, the chief picked one person. He picked someone who had been promoted out of the same promotion cycle that Massaro had already claimed was discriminatory, and they picked the third. And two of them agreed with Massaro, and one said that, you know what, we should sustain this. But a disciplinary transfer is not appropriate because the comment that was, he has no history, Massaro has no history of making any inappropriate comments or mistreating any of the recruits. He's been in that position. He's done a great job. And this was a private conversation with a superior officer in a private office, and there was no reason to think that he would make these comments to others. Nor was this, to answer Your Honor's question, there were three different documents that Rossler issued. I think one was titled a response to the panel findings hearing. The other was the written reprimand, and the third was the disciplinary transfer. And they all set out the reasons for the adverse action, and none of them address these foul language charges from 10 and 15 years ago. So I don't think that those had anything. But something else that we haven't addressed yet is the inconsistent statements. And courts have held that inconsistent statements and inconsistent reasons for the termination or the adverse action are enough to prevail at summary judgment. And here we have that at every step of the way. You have it, as Your Honor mentioned, with the putting them on leave. Thank you very much. Hold on a second. You have some questions? All right. Thank you, Your Honor. Would you like to take a break, or would you like to go on? Pardon? You okay with going? You want to take a break? You okay with going forward? Okay. If you all go shake hands. My hand is figuratively there. But thank you both for your arguments. And then we'll move into our next case.
judges: J. Harvie Wilkinson III, A. Marvin Quattlebaum Jr., Allison J. Rushing